United States Bankruptcy Court
Southern District of Texas

**ENTERED**

October 10, 2025

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 24-32697** |
| **WILLIAM MASTON HICKMAN II,** | § | |
| | § | **CHAPTER 7** |
| Debtor. | § | |
| | § | |
| **FROST BANK,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 24-3145** |
| | § | |
| **WILLIAM MASTON HICKMAN II and DOOR EAGLE,** | § | |
| | § | |
| | § | |
| Defendants. | § | |

### <u>MEMORANDUM OPINION</u>

This adversary stems from two promissory notes between Frost Bank and Door Eagle LLC, with William M. Hickman, II as a guarantor of those promissory notes. Frost Bank brought this adversary seeking damages against William M. Hickman, II and Door Eagle LLC for their failure to perform under the promissory notes and guarantee, and to have the resultant judgement debt owed by William M. Hickman, II deemed non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B). As to the breach of contract claims, the Court entered summary judgement in this adversary in favor of Frost Bank, awarding Frost Bank actual damages and prejudgment interest in the total amount of $1,235,536.98, plus interest of $310.95 per day under Section 304.002 of the Texas Finance Code. On August 20, 2025, the Court conducted a one day trial and for the reasons stated herein, the Court finds that the judgement debt owed to Frost Bank by William M. Hickman, II in the total amount of $1,235,536.98, plus interest of $310.95 per day under Section 304.002 of the Texas Finance Code, is not excepted from discharge pursuant to 11 U.S.C. §523(a)(2)(B).

Additionally, because the judgement debt owed to Frost Bank by William M. Hickman, II in the total amount of $1,235,536.98, plus interest of $310.95 per day, is not excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B), Plaintiff's claim in its complaint for reasonable and necessary attorney fees under Tex. Civ. Prac. & Rem. Code § 38.00 must be denied.

## I.   FINDINGS OF FACT

This Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, which is made applicable to adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7052.  To the extent that any finding of fact constitutes a conclusion of law, it is adopted as such.  To the extent that any conclusion of law constitutes a finding of fact, it is adopted as such.  This Court made certain oral findings and conclusions on the record.  This Memorandum Opinion supplements those findings and conclusions.  If there is an inconsistency, this Memorandum Opinion controls.

## A. Background

1. On June 8, 2024 (the "*Petition Date*") William M. Hickman, II ("*Debtor or Defendant*") filed for bankruptcy protection under chapter 7 of the Bankruptcy Code[1] initiating the bankruptcy case.[2]

2. On July 17, 2024, Frost Bank, ("*Plaintiff*") initiated this instant adversary proceeding[3] and filed an amended complaint on December 6, 2024 (the "*Complaint*").[4]

3. On December 30, 2024, Plaintiff filed its Notice of Consent to the entry of a final judgment on all non-core matters by this Court.[5]

---

[1] Any reference to "Code" or "Bankruptcy Code" is a reference to the United States Bankruptcy Code, 11 U.S.C., or any section (i.e.§) thereof refers to the corresponding section in 11 U.S.C.
[2] Bankr. ECF No. 1. "Bankr. ECF" refers docket entries made in the Debtor's bankruptcy case, No. 24-32697.  Entries made in Plaintiff's Case number 24-3145 shall take the format of ECF No. __.
[3] ECF No. 1.
[4] ECF No. 22.
[5] ECF No. 23.

4.  On January 3, 2025, Debtor filed an answer (the "*Answer*") where Debtor expressly consented to the entry of a final judgment on all non-core matters by this Court.[6]

5.  On Wednesday, August 20, 2025 the Court conducted a one-day trial and now issues its instant Memorandum Opinion and accompanying Judgment.[7]

## II.    CONCLUSIONS OF LAW

### A.  Jurisdiction and Venue

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334 and exercises its jurisdiction in accordance with Southern District of Texas General Order 2012–6.[8]  Section 157 allows a district court to "refer" all bankruptcy and related cases to the bankruptcy court, wherein the latter court will appropriately preside over the matter.[9]  This Court determines that pursuant to 28 U.S.C. § 157(b)(2)(A), (O) and (I), this proceeding contains core matters, as it primarily involves proceedings concerning the administration of this estate and determinations as to the dischargeability of particular debts.[10] This proceeding is also core under the general "catch-all" language because such a suit is the type of proceeding that can only arise in the context of a bankruptcy case.[11]

This Court may only hear a case in which venue is proper.[12]  28 U.S.C. § 1409(a) provides that "a proceeding arising under title 11 or arising in or related to a case under title 11 may be

---

[6] ECF No. 24 at ¶ 5.
[7] Aug. 20, 2025 Min. Entry.
[8] *In re: Order of Reference to Bankruptcy Judges*, Gen. Order 2012–6 (S.D. Tex. May 24, 2012).
[9] 28 U.S.C. § 157(a); *see also* In re: Order of Reference to Bankruptcy Judges, Gen. Order 2012-6 (S.D. Tex. May 24, 2012).
[10] *See* 11 U.S.C. § 157(b)(2)(A) & (O).
[11] *See Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.") (quoting *Wood v. Wood (In re Wood),* 825 F.2d 90, 97 (5th Cir. 1987)).
[12] 28 U.S.C. § 1408.

commenced in the district court in which such case is pending." Debtor's main bankruptcy case is pending in this Court and therefore, venue of this proceeding is proper.

## B. Constitutional Authority to Enter a Final Order

While bankruptcy judges can issue final orders and judgments for core proceedings, absent consent, they can only issue reports and recommendations on non-core matters.[13] The instant complaint pending before this Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (O) and (I). Accordingly, this Court concludes that the narrow limitation imposed by *Stern* does not prohibit this Court from entering a final order here.[14] Alternatively, this Court has constitutional authority to enter a final order because all parties in interest have expressly consented, impliedly if not explicitly, to adjudication of this dispute by this Court.[15] Plaintiff and Debtor have expressly consented to entry of final orders on non-core matters by this Court.[16] No other parties has ever objected to this Court's constitutional authority to enter a final order or judgment. These circumstances unquestionably constitute implied consent. Thus, this Court wields the constitutional authority to enter a final order here.

## III.   ANALYSIS

## A.   Joint stipulation of facts

---

[13] *See* 28 U.S.C. §§ 157(b)(1), (c)(1); *see also Stern v. Marshall*, 564 U.S. 462, 480 (2011); *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1938–40 (2015).

[14] See, e.g., *Badami v. Sears (In re AFY, Inc.),* 461 B.R. 541, 547-48 (8th Cir. BAP 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); see also *Tanguy v. West (In re Davis),* No. 00-50129, 538 F. App'x 440, 443 (5th Cir. 2013) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect' .... We decline to extend *Stern's* limited holding herein.") (Citing *Stern*, 564 U.S. at 475, 503, 131 S.Ct. 2594).

[15] *Wellness Int'l Network, Ltd. v. Sharif,* 575 U.S.655, 135 S. Ct. 1932, 1947, 191 L.Ed.2d 911 (2015) ("*Sharif* contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent . . . .").

[16] ECF Nos. 23; 24.

On April 23, 2025, the parties filed their Joint Pretrial Order[17] which contained the following stipulation of facts with citations to the record:

1. On January 14, 2014, Debtor and Judith A. Noble ("*Mrs. Noble*") entered into a prenuptial agreement (the "*Prenuptial*").[18]

2. The Prenuptial identified Debtor's and Mrs. Noble's separate property prior to the marriage.[19]

3. Debtor identified the following as his separate property: 10034 Meadowlake Lane Houston, Texas 77042 (the "*Meadowlake Property*") and 14511 Waterville Way Houston, Texas 77015 (the "*Waterville Property*").[20]

4. Mrs. Noble identified the following as her separate property: 904 Memorial Village Drive Houston, Texas 77024 (the "*Memorial Village Property*").[21]

5. On or about August 11, 2016, Debtor purchased the real property located at 317 Kingfisher Point, McCormick, SC 29835 (the "*Kingfisher Property*")[22]

6. On or about August 19, 2016, Debtor conveyed Kingfisher Property to himself and Mrs. Noble.[23]

7. On June 6, 2017, Debtor provided his Personal Financial Statement (the "2017 PFS") to Plaintiff.[24]

8. The 2017 PFS identified the Meadowlake Property as Debtor's homestead and valued it at $600,000 with a $90,000 mortgage for a net equity interest of $510,000.[25]

9. The 2017 PFS identified the Kingfisher Property as Debtor's wholly owned real estate and valued it at $580,000 with a $300,000 mortgage for a net equity interest of $280,000.[26]

10. The 2017 PFS identified the Waterville Property as Debtor's wholly owned real estate and valued it at $180,000 with no mortgage for a net equity interest of $180,000.[27]

---

[17] ECF No. 36.
[18] ECF No. 35-15.
[19] ECF No. 35-15.
[20] ECF No. 35-15 at 26.
[21] ECF No. 35-15 at 28.
[22] ECF No. 35-16.
[23] ECF No. 35-17.
[24] ECF No. 37-2.
[25] ECF No. 37-2.
[26] ECF No. 37-2.
[27] ECF No. 37-2.

11. On or about October 17, 2017, Plaintiff, as lender, and Door Eagle, LLC ("*Door Eagle*") as borrower, executed a promissory note in the original principal sum of $370,604.29 (the "*$370M Loan*"). [28]

12. In additional consideration for Plaintiff making the $370M Loan to Door Eagle, Debtor executed a Commercial Guaranty (the "*Hickman Guaranty*") whereby Debtor absolutely and unconditionally guaranteed and promised to pay Plaintiff the indebtedness of Door Eagle then existing or thereafter arising. [29]

13. On or about October 19, 2018, Debtor provided his Personal Financial Statement (the "*2018 PFS*") to Plaintiff. [30]

14. Debtor identified Mrs. Noble as his spouse on the 2018 PFS but represented to Plaintiff that the 2018 PFS was an "Individual Statement."[31]

15. Only Debtor, and not Mrs. Noble, signed the 2018 PFS. [32]

16. The 2018 PFS reads, in part, as follows:

The undersigned specifically acknowledges and agrees that: (1) Frost Bank, a Texas state bank, … ("Bank") will rely on the information contained in and provided in connection with this Statement, and all such information is given for the purpose of obtaining a loan(s) or other extension of credit from the Bank ("Loan"); …

The undersigned certifies that the information provided in and given in connection with the Statement is true and correct as of the date set forth opposite the signature(s) on this Statement. … The undersigned acknowledges that any intentional or negligent misrepresentation of such information may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both, under the provisions of Title 18, United States Code, Section 1014 and liability for monetary damages to the Bank and any other person or entity who may suffer any loss due to reliance upon any misrepresentation which has been made in or in connection with this Statement. [33]

17. Schedule 7 of the 2018 PFS included a section for Debtor to list his homestead. Debtor did not list any of his real estate as his homestead. [34]

---

[28] ECF No. 35-18.
[29] ECF No. 35-19.
[30] ECF No. 35-1.
[31] ECF No. 35-1.
[32] ECF No. 35-1.
[33] ECF No. 35-1.
[34] ECF No. 35-1.

18. Schedule 7 of the 2018 PFS also included a section for Debtor to list his "Other Wholly Owned Real Estate." In this section, Debtor listed the following real estate: the Waterville Property; the Meadowlake Property; the Memorial Village Property; and the Kingfisher Property.[35]

20. In the 2018 PFS, Debtor answered "No" to the question: "Were any of the Assets (i) owned or claimed by your spouse before marriage, or (ii) acquired by your spouse during marriage by gift or inheritances, or (iii) recovered for personal injuries sustained by your spouse during marriage, or (iv) acquired from the proceeds of liquidations of any of the preceding?"[36]

21. On or about November 27, 2018, Plaintiff, as lender, and Door Eagle, as borrower, executed a promissory note in the original principal sum of $750,000 (the "*$750 Loan*").[37]

22. On July 19, 2019, Debtor deeded the Waterville Property to his son, William Hickman, III.[38]

23. By letter dated January 17, 2020 (the "*$370M Loan Demand Letter*"), Plaintiff made a formal demand upon Door Eagle and Debtor to honor the terms of the $370M Loan and Hickman Guaranty and to pay the $370M Loan as agreed.[39]

24. The $370M Loan Demand Letter gave Door Eagle and Debtor until 3:00 p.m. on January 22, 2020, to pay the principal balance and outstanding interest due on the $370M Loan.[40]

25. By letter dated January 17, 2020 (the "*$750M Loan Demand Letter*"), Plaintiff made formal demand upon Door Eagle and Debtor to honor the terms of the $750M Loan and Hickman Guaranty and to pay the $750M Loan as agreed.[41]

26. The Demand Letter gave Door Eagle and Debtor until 3:00 p.m. on January 22, 2020, to pay the principal balance and outstanding interest due on the $750M Loan.[42]

27. Door Eagle and Debtor did not make the payments on the $370M Loan or $750M Loan as demanded.

28. On February 4, 2020, Plaintiff sued Door Eagle and Debtor in the 165th Judicial District

---

[35] ECF No. 35-1.
[36] ECF No. 35-1.
[37] ECF No. 35-2.
[38] ECF No. 37-5.
[39] ECF No. 35-6.
[40] ECF No. 35-6.
[41] ECF No. 35-7.
[42] ECF No. 35-7.

Court of Harris County, Texas in Cause No. 2020-07794, styled *Frost Bank v. Door Eagle, LLC and William Hickman, II*. [43]

29. On March 5, 2020, Mrs. Noble formed JNH Holdings, LLC, a South Carolina limited liability company. [44]

30. On May 29, 2020, Mrs. Noble sold the Memorial Village Property (an asset that Debtor represented to Plaintiff as being owned by Debtor) for approximately $300,000. [45]

31. None of the sales proceeds from the Memorial Village Property were paid to Plaintiff to reduce Debtor's indebtedness to Plaintiff.[46]

32. On April 21, 2022, Debtor and Mrs. Noble sold the Kingfisher Property. [47]

33. On June 8, 2024, Debtor filed his Petition. [48]

34. The only real estate identified in the Debtor's Petition that Debtor identified on the 2018 PFS was the Meadowlake Property.[49]

35. At the meeting of creditors held on July 25, 2024, Debtor maintained that he never owned the Memorial Village Property. [50]

36. At the meeting of creditors held on July 25, 2024, Debtor maintained that he had sold the Waterville Property to his son in 2017. [51]

37. At the meeting of creditors held on July 25, 2024, Debtor maintained that the Kingfisher Property was owned one half by Mrs. Noble who received one half of the proceeds of the sale when it was sold in 2023. [52]

38. Door Eagle defaulted on its obligation to make payments to Plaintiff under the terms of the $370M Loan and the $750M Loan.[53]

39. Despite demand, Door Eagle refused to honor its obligations pursuant to the terms of the $370M Loan and $750M Loan and Debtor has refused to honor his obligations

---

[43] ECF No. 35-11.
[44] ECF No. 35-12.
[45] ECF No. 35-20.
[46] ECF No. 36 at ¶ 34.
[47] ECF No. 35-21.
[48] ECF No. 35-13.
[49] ECF No. 35-14 at 22, 35.
[50] ECF No. 35-14 at 21.
[51] ECF No. 35-14 at 33, 34.
[52] ECF No. 35-14 at 33, 34.
[53] ECF Nos. 36 at ¶ 41; 28 at 4.

pursuant to the terms of the Hickman Guaranty.[54]

## B.    The Complaint

In its Complaint, Plaintiff has pled the following causes of action, to wit: (1) breach of contract claims for Debtor and Door Eagles' failure to perform under the terms of the $370M Loan, $750M Loan and Hickman Guaranty; (2) recovery of reasonable and necessary attorney fees pursuant to the terms of the $370M Loan and $750M Loan and Tex. Civ. Prac. & Rem. Code § 38.001; and (3) a determination that the debt owed by Debtor to Plaintiff on the breach of contract claims and associated attorney fees under Tex. Civ. Prac. & Rem. Code § 38.001 is non-dischargeable pursuant to § 523(a)(2)(B).[55]

The Court granted summary judgment as to the breach of contract claims on March 4, 2025.[56] Specifically, the Court award Plaintiff actual damages in the amount of $639,424.89, and prejudgment interest in the amount of $596,112.09, for a total of $1,235,536.98, plus interest of $58.01 per day on the $370M Loan, and $252.94 interest per day on the $750M Loan under Section 304.002 of the Texas Finance Code (the "*Judgement Debt*").[57] However, as to the claim for attorney fees pursuant to Tex. Civ. Prac. & Rem. Code § 38.00, and non-dischargeability of debt pursuant § 523(a)(2)(B), summary judgment was denied.[58] On August 20, 2025, the Court held a trial and determined that it would reserve ruling on the amount of attorney fees under Tex. Civ. Prac. & Rem. Code § 38.00 pending ruling on whether the Judgement Debt owed to Plaintiff by

---

[54] ECF Nos. 36 at ¶ 41; 28 at 4
[55] ECF No. 22 at 6–8.
[56] ECF No. 28.
[57] ECF No. 28 at 4.
[58] ECF No. 28 at 4.

Debtor is non-dischargeable under § 523(a)(2)(B).[59] Thus, the Court will now determine whether the Judgement Debt owed to Plaintiff by Debtor is non-dischargeable pursuant to § 523(a)(2)(B).

## C.     Credibility of witnesses

It is the Court's duty to assess and weigh the credibility of witnesses.[60] At trial, the Court heard testimony from two witnesses: (a) Debtor and (b) Brian Fowler ("*Mr. Fowler*"). Mr. Fowler is an account manager and representative of Plaintiff who testified as to his involvement in assessing Debtor's credit worthiness in connection with the $750M Loan and Hickman Guarantee.[61] At trial, Debtor and Mr. Fowler responded to questions clearly, completely, and directly.[62] Thus, the Court finds that each witness is credible and gives equal weight to the testimony of each witness.

## D.     Fraud under 11 U.S.C. § 523(a)(2)(B)

Plaintiff asserts that the Judgement Debt is non-dischargeable pursuant to § 523(a)(2)(B) because: (1) Debtor submitted the 2017 PFS and 2018 PFS in connection with the $370M Loan, $750M Loan and Hickman Guarantee; (2) the 2017 PFS and 2018 PFS contained written statements respecting Debtor's financial condition that were materially false; (3) Plaintiff reasonably relied on the material misrepresentations in the 2017 PFS and 2018 PFS in agreeing to issue the $370M Loan and $750M Loan to Door Eagle; and (4) Debtor made the misrepresentations in the  2017 PFS and 2018 PFS with an intent to deceive Plaintiff into issuing the $370M Loan and $750M Loan.[63] Specifically, the alleged material misrepresentations in the

---

[59] Aug. 20, 2025 Min. Entry.
[60]  *O'Connor v. Burg* (*In re Burg*), 641 B.R. 120 (Bankr. S.D. Tex. 2022); *In re Bigler LP*, 458 B.R. 345, 367 (Bankr. S.D. Tex. 2011) (citing *Port Arthur Towing Co. v. John W. Towing, Inc*, 42 F.3d 312, 318 (5th Cir. 1995)).
[61] Aug. 20, 2025 Courtroom Trial (Fowler testimony on direct).
[62] *See, e.g., In re Ali*, 2015 Bankr. LEXIS 2443, 2015 WL 4611343 at *4 (Bankr. W.D. Tex. July 23, 2015) (analyzing the clarity, completeness, and quality of witness responses in order to make credibility determinations).
[63] ECF Nos. 22; 36 at 1–2.

2017 PFS and 2018 PFS, which Plaintiff alleges it relied upon, pertain to Debtor's ownership interest in the Waterville Property; Meadowlake Property; Kingfisher Property; and Memorial Village Property.[64]

Pursuant to 11 U.S.C § 523 – Exceptions to Discharge:

(a) A discharge under section 727, 1141, 1192, 1228(a), 1228(b) or 1328 (b) of this title does not discharge an individual debtor from any debt – (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— (B) use of a statement in writing – (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive . . . .

The Court will consider whether Plaintiff has met its burden of proving, by a preponderance of the evidence, each element of § 523(a)(2)(B).[65]

### 1.  Use of a statement in writing

A statement respecting the debtor's financial condition must be in writing to make a debt non-dischargeable under the § 523(a)(2)(B). [66] "The debtor must have written, signed, or adopted the writing."[67] Written statements evidencing a debtor's financial condition may include "balance sheets, income statements, statements of changes in overall financial position, or income and debt statements that present the debtor or insider's net worth, overall financial health, or equation of assets and liabilities."[68]

---

[64] ECF No. 22.

[65] *Country Credit, LLC v. Martin* (*In re Martin*), 513 B.R. 303, 308 (Bankr. S.D. Miss. 2014) ("With respect . . . § 523(a)(2)(B), 'the creditor must prove by a preponderance of the evidence that the debt is nondischargeable.'") (citing *Recoveredge, L.P. v. Pentecost*, 44 F.3d 1284, 1289 (5th Cir. 1995)).

[66]  11 U.S.C. § 523(a)(2)(B); *Field v. Mans*, 516 U.S. 59, 64 (1995).

[67] *Zeba, LLC v. Hosseini* (*In re Hosseini*), Nos. 18-20177, 19-2001, 2021 Bankr. LEXIS 1319, at *23 (Bankr. S.D. Tex. May 14, 2021).

[68] *Heritage Bank v. McCraken* (*In re McCracken*), 586 B.R. 247, 255 (Bankr. S.D. Tex. 2018).

In connection with the $370M Loan, $750M Loan, and Hickman Guarantee, Debtor submitted to Plaintiff the 2017 PFS and the 2018 PFS.[69] The 2017 PFS and 2018 PFS each included written statements setting forth Debtor's net worth, including details of Debtor's property ownership of real estate, cash, and personal property.[70] Both the 2017 PFS and 2018 PFS were signed by Debtor.[71] Thus, the 2017 PFS and 2018 PFS contained "statement[s] in writing . . . respecting the debtor's or an insider's financial condition," pursuant to § 523(a)(2)(B).

### 2. Use of a statement in writing that is materially false

Section 523(a)(2)(B)(i) requires that the written statement relied upon to incur the debt be materially false.[72] A materially false financial statement is one which "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit."[73] "[M]ateriality should be judged by comparing the debtor's actual financial condition with the picture debtor paints of it."[74] "To be shown as 'materially false,' the document must not only be erroneous, but also contain information causing the document to be substantially inaccurate."[75] "[I]t is well-established that writings with pertinent omissions may qualify as 'materially false' for purposes of § 523(a)(2)(B)."[76] A false statement about a single asset can be a materially false "statement respecting the debtor's financial condition."[77]

---

[69] ECF Nos. 37-1; 37-2.
[70] ECF Nos. 37-1; 37-2.
[71] ECF Nos. 37-1; 37-2.
[72] 523(a)(2)(B)(i).
[73] *In re Jordan*, 927 F.2d 221, 224 (5th Cir. 1991).
[74] *In re Nance*, 70 B.R. 318, 321 (Bankr. N.D. Tex. 1987).
[75] *First Nat'l Bank of Byers, N.A.* v. *Slonaker* (*In re Slonaker*), 269 B.R. 595, 603 (Bankr. N.D. Tex. 2001).
[76] *In re Jordan*, 927 F.2d 221, 224 (5th Cir. 1991).
[77] *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 712 (2018).

Plaintiff asserts that it relied on misrepresentations made in the 2017 PFS and 2018 PFS in making its decision to extend the $370M Loan and $750M Loan to Eagle Door.[78] The Court will thus determine whether statements were made in the 2017 PFS and 2018 PFS that constituted material misrepresentations respecting the debtor's financial condition under § 523(a)(2)(B).

The 2017 PFS identified the following real estate property: (1) the Kingfisher Property as Debtor's "wholly owned" real estate valued at $580,000 with a $300,000 mortgage for a net equity interest of $280,000; (2) the Waterville Property as Debtor's "wholly owned" real estate valued at $180,000 with no mortgage for a net equity interest of $180,000; and (3) the Meadowlake Property as Debtor's homestead valued at $600,000 with a $90,000 mortgage for a net equity interest of $510,000.[79] The real estate disclosed on the 2017 PFS is summarized in Table 1 below:

| Table 1: Summary of Real Estate in 2017 PFS | | | |
|---|---|---|---|
| **Property** | **Market Value** | **Mortgage amount** | **Net equity** |
| Kingfisher Property | $580,000 | $300,000 | $280,000 |
| Waterville Property | $180,000 | $0 | $180,000 |
| Meadowlake Property (Homestead) | $600,000 | $90,000 | $510,000 |
| **Total** | $1,360,000 | $390,000 | $970,000 |
| **Total excluding homestead** | $760,000 | $300,000 | $460,000 |

The 2018 PFS identified the following real estate: (1) the Kingfisher Property as Debtor's "wholly owned" property valued at $600,000 with a $300,000 mortgage for a net equity interest of $300,000;[80] (2) the Waterville Property as Debtor's "wholly owned" real estate valued at $175,000 with no mortgage for a net equity interest of $175,000; (3) the Meadowlake Property as

---

[78] ECF No. 22 at 8–9.
[79] ECF No. 37-2 at 3.
[80] ECF No. 37-2 at 3.

Debtor's "wholly owned" property valued at $600,000 with no mortgage for a net equity interest of $600,000; and (4) the Memorial Village Property as Debtor's "wholly owned" property valued at $450,000 with a $70,000 mortgage for a net equity of $380,000.[81] The real estate disclosed on the 2018 PFS is summarized in Table 2 below:

| Table 2: Summary of Real Estate in the 2018 PFS | | | |
|---|---|---|---|
| Property | Market Value | Mortgage amount | Net equity |
| Kingfisher Property | $600,000 | $300,000 | $300,000 |
| Waterville Property | $175,000 | $0 | $175,000 |
| Meadowlake Property | $600,000 | $0 | $600,000 |
| Memorial Village Property | $450,000 | $70,000 | $380,000 |
| Total | $1,825,000 | $370,000 | $1,455,000 |

Debtor, in the 2017 PFS and 2018 PFS, answered "No" to the following question: "Were any of the Assets (i) owned or claimed by your spouse before marriage, or (ii) acquired by your spouse during marriage by gift or inheritances, or (iii) recovered for personal injuries sustained by your spouse during marriage, or (iv) acquired from the proceeds of liquidations of any of the preceding?"[82]

Debtor transferred the Kingfisher Property to himself and Mrs. Noble as tenants in common on August 29, 2016, which was before Debtor submitted the 2017 PFS on June 6, 2017 and the 2018 PFS on October 19, 2018.[83] Thus, when Debtor represented in the 2017 PFS and 2018 PFS that he wholly owned the Kingfisher Property, that representation was false.[84] Therefore, Debtor's

---

[81] ECF No. 37-1 at 3.
[82] ECF Nos. 37-1 at 4; 37-2 at 4.
[83] ECF No. 35-17.
[84] ECF Nos. 35-17; 37-1; 37-2.

representation on his 2017 PFS and 2018 PFS that he wholly owned the Kingfisher Property was a misrepresentation respecting his financial condition under § 523(a)(2)(B).

On July 19, 2019, Debtor deeded the Waterville Property to his son, William Hickman, III.[85] Plaintiff asserts that Debtor's representation that he owned the Waterville Property was false because Debtor always intended to convey the property to his son and never intended it to remain as collateral and a source for repayment of the debt owed to Plaintiff.[86] However, under the plain language of § 523(a)(2)(B), only a false statement "respecting the debtor's or an insider's financial condition" can be grounds for non-discharge.[87] Plaintiff has not shown that at the time Debtor submitted the 2017 PFS and 2018 PFS, he did not in fact wholly own the Waterville Property.[88] Thus, the Court finds that Debtor's representation in the 2017 PFS and 2018 PFS that he wholly owned the Waterville Property was not a misrepresentation respecting his financial condition under § 523(a)(2)(B).

Debtor admitted at trial that at the time he filled out the 2017 PFS and 2018 PFS, the Meadowlake Property was his homestead.[89] Debtor indicated that the Meadowlake Property was his homestead in the 2017 PFS but did not identify the Meadowlake Property as a homestead in the 2018 PFS.[90] The homestead status of a property affects the ability of a lender to use the property as recovery of a loan.[91] Therefore, Debtor's representation in the 2018 PFS that he owned the

---

[85] ECF Nos. 37-5; 37-6; 35-14 at 24; Aug. 20, 2025 Courtroom Trial (Debtor testifying).
[86] ECF No. 36-1 at 10.
[87] 11 U.S.C. § 523(a)(2)(B)(ii).
[88] *See Summit Credit Union v. Goldbeck* (*In re Goldbeck*), 590 B.R. 881, 891 (Bankr. W.D. Wis. 2018) ("[Plaintiff's] argument stretches the meaning of 'financial condition' further than even the broadest definition in existing case law. The projected costs of construction say nothing about Defendant's net worth or whether he owned an asset. And the Facility was not even built and there was no asset to own. The projected balance sheet was merely a forecast about future potential and thus not a representation of fact about financial condition.").
[89] Aug. 20, 2025 Courtroom Trial (Debtor testifying).
[90] ECF Nos. 37-1; 37-2.
[91] *See Blodgett v. BAC Home Loans Servicing, LP*, No. 4:11-cv-00051, 2012 U.S. Dist. LEXIS 1524, at *3 n.2 (E.D. Tex. Jan. 6, 2012).

Meadowlake Property as a non-homestead property was a misrepresentation respecting his financial condition under § 523(a)(2)(B).

The evidence shows that Debtor never owned the Memorial Village Property. At the meeting of creditors held on July 25, 2024, Debtor maintained that he never owned the Memorial Village Property and that it was wholly owned by Mrs. Noble at the time that Debtor submitted his 2018 PFS.[92] Debtor admitted as such at trial.[93] Therefore, Debtor's representation on his 2018 PFS that he owned the Memorial Village Property was a misrepresentation respecting his financial condition under § 523(a)(2)(B).

A review of the 2017 PFS and 2018 PFS would lead one to believe that Debtor has substantially more non-exempt assets than he did. As to the 2017 PFS, Debtor listed his net equity in the Kingfisher Property at $280,000.[94] Since Debtor in fact owned the Kingfisher Property as tenants in common with Mrs. Noble, Debtor overstated his net worth in the 2017 PFS by $140,000.[95]

As for the 2018 PFS, Debtor also misrepresented that he wholly owned the Kingfisher Property, when in fact he owned it as a tenant in common with Mrs. Noble.[96] He listed his net equity in the Kingfisher Property as $300,000, thereby overstating it by $150,000.[97] Next, Debtor listed the Meadowlake Property in the 2018 PFS as his wholly owned non-homestead property with a net equity of $600,000.[98] Since the Meadowlake Property was Debtor's homestead, Debtor misrepresented his non-homestead equity interest in the Meadowlake Property by $600,000.[99]

---

[92] ECF No. 35-14 at 22, 35.
[93] Aug. 20, 2025 Courtroom Trial (Debtor testifying).
[94] ECF No. 37-2.
[95] ECF Nos. 37-2; 35-17.
[96] ECF Nos. 37-1; 35-17.
[97] ECF Nos. 37-1; 35-17.
[98] ECF No. 37-1.
[99] ECF No. 37-1; Aug 20. 2025 Courtroom Trial (Debtor testifying).

Finally, in his 2018 PFS, Debtor represented that he wholly owned the Memorial Village Property and listed his net equity in the property at $380,000 when it was in fact wholly owned by Mrs. Noble.[100] Thus, Debtor overstated his net equity in the Memorial Village Property by $380,000. In total, Debtor overstated his equity in non-homestead real estate in the 2018 PFS by $1,130,000, which exceeds the total loan amount of the $750M Loan.

Because of Debtor's misrepresentations regarding his true ownership interest in the real estate listed in the 2017 PFS and 2018 PFS, Debtor presented the Plaintiff with a substantially untruthful picture of his financial conditions. When deciding whether to loan money to a company as the owner as a guarantor, a reasonable lender would consider whether the owner has sufficient assets to repay the loan. Indeed, Mr. Fowler testified that a guarantor's' networth and ownership of non-exempt assets are factors that Plaintiff considers when deciding whether to extend credit.[101] Thus, given the Debtor's significant overstatement of his networth and property interest in non-exempt assets, the Court finds that Debtor's misrepresentations in the 2017 PFS and 2018 PFS regarding his ownership interest in the Waterville Property; Meadowlake Property; Memorial Village Property; and Kingfisher Property were material misrepresentations for purposes of §523(a)(2)(B).[102]

### 3.  Use of a statement in writing on which creditor reasonably relied

---

[100] ECF No. 37-1; Aug 20. 2025 Courtroom Trial (Debtor testifying).

[101] *See In re Jordan*, 927 F.2d 221, 224 (5th Cir. 1991) ("[I]n determining whether a false statement is material, a relevant although not dispositive inquiry is 'whether the lender would have made the loan had he known the debtor's true situation.'"); Aug. 20, 2025 Courtroom trial (Mr. Fowler testifying).

[102] *See In re Rodriguez*, 29 B.R. 537, 539 (Bankr. E.D.N.Y. 1983) ("An understatement of a debtor's liability by approximately 25 per cent, as well as an overstatement by $12,000 of the value of real property owned by the debtor, have both been held to be material misrepresentations sufficient to bar a discharge" under § 523(a)(2)(B).); *In re Nance*, 70 B.R. 318, 322 (Bankr. N.D. Tex. 1987) ("The Courts have held that  misrepresentation of ownership is a material falsity sufficient to deny dischargeability pursuant to § 523(a)(2)(B).").

Reliance under § 523(a)(2)(B) requires that the creditor in fact relied on a material misrepresentation and that the reliance was reasonable.[103] Even partial reliance is sufficient under § 523(a)(2)(B) as long as it is reasonable.[104] For purposes of § 523(a)(2)(B), the reasonableness of a creditor's reliance is a question of fact and is evaluated in light of the totality of the circumstances.[105] The Fifth Circuit held that in determining the reasonableness of reliance, a bankruptcy court may consider, among other things:

> whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.[106]

Likewise, the Fifth Circuit has noted that "[w]hen courts have found a creditor did not reasonably rely on a debtor's falsehoods, they have generally highlighted numerous red flags the creditor willfully ignored."[107] "[T]he reasonable reliance requirement is a low hurdle for creditors to satisfy. The requirement is primarily meant to target bad-faith creditors who ignore red flags with the knowledge that they can later avoid the debtor's discharge under § 523(a)(2)(B)."[108]

The Court will first address the misrepresentations in the 2017 PFS. Mr. Fowler testified that, although he had reviewed the 2017 PFS, he considered it outdated when Debtor submitted the 2018 PFS.[109] Mr. Fowler testified that he relied on the financial information in the 2018 PFS, along with Door Eagle's prior payment history on the $370M Loan, to determine whether to recommend that Plaintiff issue the $750M Loan to Door Eagle.[110] Because Mr. Fowler

---

[103] *Field v. Mans*, 516 U.S. 59, 68, 116 S. Ct. 437, 442 (1995).
[104] *First Nat'l Bank of Byers, N.A. v. Slonaker* (*In re Slonaker*), 269 B.R. 595, 606 (Bankr. N.D. Tex. 2001).
[105] *Coston v. Bank of Malvern* (*In re Coston*), 991 F.2d 257, 261 (5th Cir. 1993).
[106] *Id.*
[107] *Veritex Cmty. Bank v. Osborne* (*In re Osborne*), 951 F.3d 691, 699 (5th Cir. 2020).
[108] *Id.*
[109] Aug. 20, 2025 Courtroom Trial (Mr. Fowler testifying).
[110] Aug. 20, 2025 Courtroom Trial (Mr. Fowler testifying).

acknowledged that the information in the 2017 PFS was outdated, the Court finds that the misrepresentation regarding Debtor's ownership interest in the Kingfisher Property in the 2017 PFS was not reasonably relied upon by Plaintiff in issuing the $750M Loan.

As for the $370M Loan, Mr. Fowler testified that he was not involved in the decision to issue the $370M Loan and that he was not involved in Debtor's or Door Eagles's account with Plaintiff at the time the $370M Loan was issued.[111] In fact, Plaintiff presented no witnesses with personal knowledge of how Plaintiff relied on the 2017 PFS in making its decision to issue the $370M Loan. Thus, the Court finds that Plaintiff has not met its burden of showing that it reasonably relied upon the misrepresentations in the 2017 PFS when it decided to issue the $370M Loan.

With respect to the 2018 PFS, Mr. Fowler credibly testified that he relied on misrepresentations concerning Debtor's ownership interests in the Waterville Property, Meadowlake Property, Memorial Village Property, and Kingfisher Property when recommending that Plaintiff extend the $750M Loan to Door Eagle.[112] He further testified that the types of false statements contained in the 2018 PFS are the kind that would materially influence a decision to extend credit.[113] Accordingly, the Court finds that Plaintiff did, in fact, rely on material misrepresentations in the 2018 PFS when issuing the $750M Loan. The remaining question is whether that reliance was reasonable.

Here, the Court finds that there were multiple "red flags" that would put a reasonable person on notice that the 2018 PFS contained inaccurate information, and that Plaintiff did not take any actions to verify the information despite these red flags. First, the 2017 PFS identified the

---

[111] Aug. 20, 2025 Courtroom Trial (Mr. Fowler testifying).
[112] Aug. 20, 2025 Courtroom Trial (Mr. Fowler testifying).
[113] Aug. 20, 2025 Courtroom Trial (Mr. Fowler testifying).

Meadowlake Property as Debtor's homestead and listed it as his home address.[114] The 2018 PFS, filed approximately one year later, again listed the Meadowlake Property as Debtor's home address but reclassified it as a non-homestead property.[115] Notably, the 2018 PFS did not designate any other property as a homestead.[116] Despite this change, Mr. Fowler never inquired as to why the property listed as a homestead in the 2017 PFS was later identified as non-homestead in the 2018 PFS, despite that it remained listed as Debtor's home address and no other property was designated as his homestead.[117] Second, the 2018 PFS listed the Memorial Village Property, which did not appear in the 2017 PFS.[118] This addition indicated that Debtor had acquired a $380,000 equity interest in real estate within roughly one year.[119] Mr. Fowler never inquired into how Debtor obtained the funds to acquire this new asset.[120] Third, the 2018 PFS, under the section that required Debtor to list his monthly cash income and cash expenses, incorrectly listed Debtor's cash income on an annual basis but listed his liabilities on a monthly basis.[121] Fourth, the 2017 PFS listed $250,000 in jewelry and furniture that were omitted from the 2018 PFS.[122] Mr. Fowler never inquired into the disposition of these assets.[123] Finally, the 2018 PFS listed Debtor's ownership interest in Door Eagle as 50%, whereas the 2017 PFS reflected a 100% ownership interest.[124] Mr. Fowler never inquired into how Debtor's ownership interest in Door Eagle had decreased by half within approximately one year.[125]

---

[114] ECF No. 37-2.
[115] ECF No. 37-1.
[116] ECF No. 37-1.
[117] ECF Nos. 37-1; 37-2; Aug. 20, 2025 Courtroom Trial (Mr. Fowler testifying).
[118] ECF Nos. 37-1; 37-2.
[119] ECF Nos. 37-1; 37-2.
[120] Aug. 20, 2025 Courtroom Trial (Mr. Fowler testifying).
[121] ECF No. 37-1; Aug. 20, 2025 Courtroom Trial (Mr. Fowler testifying).
[122] ECF Nos. 37-2; 37-1.
[123] Aug. 20, 2025 Courtroom Trial (Mr. Fowler testifying).
[124] ECF Nos. 37-2; 37-1.
[125] Aug. 20, 2025 Courtroom Trial (Mr. Fowler testifying).

Mr. Fowler testified that he relied on the Debtor's signature which attested to the truth of the information in the 2018 PFS.[126] However, because of the discrepancies between the 2017 PFS and the 2018 PFS, as well as inconsistencies within the 2018 PFS itself, the Court finds that Mr. Fowler, acting on behalf of Plaintiff, could not have reasonably relied on the information in the 2018 PFS without conducting at least a minimal investigation into its accuracy.[127] Mr. Fowler was repeatedly asked what steps he took to verify the information in the 2018 PFS, and his testimony shows that he did nothing.[128] Specifically, no title search or UCC search was conducted to confirm the information.[129] Although Debtor's credit report was obtained when Door Eagle applied for the $370M Loan, no credit report was obtained at the time Door Eagle applied for the $750M Loan.[130] Moreover, the credit report that was obtained was never admitted into evidence, and Mr. Fowler offered no testimony of its contents. Thus, the Court finds that Plaintiff willfully ignored multiple red flags suggesting that the information in the 2018 PFS may have been false. As such, the Court finds that Plaintiff's reliance on the misrepresentations contained in the 2018 PFS was not reasonable.

Accordingly, the Court finds that Plaintiff did not reasonably rely on the misrepresentations in the 2017 PFS and the 2018 PFS when it decided the issue the $370M Loan and the $750M Loan.

### 4. Use of a statement in writing that the debtor caused to be made with an intent to deceive

Section 523(a)(2)(B) requires that the debtor made a false statement in writing with the intent to deceive.[131] "A judge may look at the totality of the circumstances and infer an intent to

---

[126] Aug. 20, 2025 Courtroom Trial (Mr. Fowler testifying).
[127] *See Coston v. Bank of Malvern* (*In re Coston*), 991 F.2d 257, 261 (5th Cir. 1993).
[128] Aug. 20, 2025 Courtroom Trial (Mr. Fowler testifying).
[129] Aug. 20, 2025 Courtroom Trial (Mr. Fowler testifying).
[130] Aug. 20, 2025 Courtroom Trial (Mr. Fowler testifying).
[131] 11 U.S.C. § 523(a)(2)(B).

deceive when '[r]eckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine' to produce such an inference."[132] An "intent to deceive may be inferred from use of a false financial statement to obtain credit."[133] "The court may consider such factors as the debtor's knowledge of and experience in financial matters, as well as whether the debtor exhibited a clear pattern of purposeful conduct when inferring deceitful intent of a debtor."[134] "[W]here a debtor testifies as to her subjective intent, the bankruptcy court must make a credibility determination, considering the debtor's testimony, along with other objective circumstantial evidence of the debtor's subjective intent."[135]

Debtor testified that he did not intend to make any misrepresentations respecting his financial condition when he completed the 2017 PFS and 2018 PFS.[136] However, Debtor admitted at trial that the information he listed in the 2017 PFS and 2018 PFS regarding his ownership interest in his real property was inaccurate.[137] Debtor offered excuses for his mistakes. First, he asserted that at the time he completed the 2017 PFS and 2018 PFS, he thought that "wholly owned" property includes real estate that is also owned by his wife, Mrs. Noble.[138] Second, Debtor testified that he was "in a hurry" when he filled out the 2018 PFS because of his immediate need to obtain financing.[139] Third, Debtor testified that he was "confused" about the information the 2017 PFS and 2018 PFS was requesting at the time he completed them.[140]

---

[132] *Morrison v. W. Builders of Amarillo, Inc*. (*In re Morrison*), 555 F.3d 473, 482 (5th Cir. 2009).
[133] *In re Young*, 995 F.2d 547, 549 (5th Cir. 1993).
[134] *Heritage Bank v. McCraken* (*In re McCracken*), 586 B.R. 247, 259 (Bankr. S.D. Tex. 2018).
[135] *AT&T Universal Card Servs. v. Mercer* (*In re Mercer*), 246 F.3d 391, 409 (5th Cir. 2001).
[136] Aug. 20, 2025 Courtroom Trial (Debtor testifying).
[137] Aug. 20, 2025 Courtroom Trial (Debtor testifying).
[138] Aug. 20, 2025 Courtroom Trial (Debtor testifying).
[139] Aug. 20, 2025 Courtroom Trial (Debtor testifying).
[140] Aug. 20, 2025 Courtroom Trial (Debtor testifying).

The Court finds these excuses without merit. Debtor could have sought clarification or assistance in completing the 2017 PFS and 2018 PFS but willfully chose not to. Debtor is an educated businessman with a degree in architecture and has managed his own business since 2011.[141] He testified that he regularly used a certified public accountant ("*CPA*") to assist with his personal and business tax returns.[142] However, despite his confusion regarding the 2017 PFS and 2018 PFS, and his ability to seek assistance, Debtor admitted that he never asked his CPA or anyone else for help in completing them.[143] He also acknowledged at trial that, although he considered the 2018 PFS an important financial document, he estimated that he spent less than two hours completing it.[144] Accordingly, the Court finds that Debtor acted in reckless disregard of the truth or falsity of the statements contained in the 2017 PFS and 2018 PFS.[145]

The Court also notes a troubling pattern by Debtor. First, Debtor transferred the Waterville Property, which he valued at $175,000, to his son for a nominal amount of $10 on July 19, 2019, after Door Eagle received the $750M Loan on November 27, 2018.[146] Then, on April 21, 2022, Debtor and Mrs. Noble sold the Kingfisher Property, which Debtor valued in the 2018 PFS at $600,000 for $891,000.[147] None of the proceeds of the sale of the Kingfisher Property were paid to Plaintiff despite the prior issuance of the $370M Loan Demand Letter and $750M Loan Demand Letter, and Debtor's awareness that he was indebted to Plaintiff under the Hickman Guarantee.[148]

Given Debtor's reckless disregard for the truth of the statements in the 2017 PFS and 2018 PFS, combined with his patterns of transferring valuable real estate listed in the 2017 PFS and

---

[141] Aug. 20, 2025 Courtroom Trial (Debtor testifying).
[142] Aug. 20, 2025 Courtroom Trial (Debtor testifying).
[143] Aug. 20, 2025 Courtroom Trial (Debtor testifying).
[144] Aug. 20, 2025 Courtroom Trial (Debtor testifying).
[145] *See In re Morrison*, 555 F.3d at 482.
[146] ECF No. 37-5.
[147] ECF Nos. 35-21; 35-14 at 33.
[148] Aug. 20, 2025 Courtroom Trial (Debtor testifying).

2018 PFS, the Court finds that Debtor made misrepresentations in the 2017 PFS and 2018 PFS with an intent to deceive Plaintiff into issuing the $370M Loan and $750M Loan.[149] Nonetheless, Plaintiff did not meet its burden of showing that it reasonably relied on the misrepresentations in the 2017 PFS and 2018 PFS when it decided to issue the $750M Loan and $370M Loan to Door Eagle.

Accordingly, the Court finds that the judgement debt owed to Frost Bank by William M. Hickman, II in the total amount of $1,235,536.98, plus interest of $310.95 per day under Section 304.002 of the Texas Finance Code, is not excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B). Additionally, because the judgement debt owed to Frost Bank by William M. Hickman, II in the total amount of $1,235,536.98, plus interest of $310.95 per day, is not excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B), Plaintiff's claim in its Complaint for reasonable and necessary attorney fees under Tex. Civ. Prac. & Rem. Code § 38.00 is denied.

## IV.    CONCLUSION

A judgment consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

**SIGNED October 10, 2025**

_____
**Eduardo V. Rodriguez**
**Chief United States Bankruptcy Judge**

---

[149] *See In re Morrison*, 555 F.3d at 482; *In re McCracken*, 586 B.R. at 259.